**IN THE UNITED STATES DISTRICT COURT
FOR THE NORTHERN DISTRICT OF IOWA
CENTRAL DIVISION**

CHRISTINE ANN DOLLAR,

          Plaintiff,

vs.

SMITHWAY MOTOR XPRESS, INC.,
SMITHWAY MOTOR XPRESS CORP.,
a Nevada Corporation,

          Defendants.

No. C09-3043-MWB

**MEMORANDUM OPINION AND
ORDER ON TRIAL ON THE
MERITS**

————————————

**TABLE OF CONTENTS**

**I. INTRODUCTION** . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 2
   *A. Procedural Background* . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 2
   *B. Findings Of Fact* . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 3

**II. LEGAL ANALYSIS** . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 13
   *A. Overview of the FMLA* . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 14
   *B. Dollar's FMLA Claims* . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 17
      *1. Dollar's FMLA retaliation claim* . . . . . . . . . . . . . . . . . . 17
      *2. Dollar's FMLA Interference Claim* . . . . . . . . . . . . . . . . . 18
         *a. Eligible employee and employer* . . . . . . . . . . . . . . . 19
         *b. Serious health condition* . . . . . . . . . . . . . . . . . . . 19
         *c. Notice* . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 22
         *d. Denial of benefits* . . . . . . . . . . . . . . . . . . . . . . . . 24
      *3. Remedies* . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 24
         *a. Compensatory damages* . . . . . . . . . . . . . . . . . . . . 26
         *b. Back pay and benefits* . . . . . . . . . . . . . . . . . . . . . 28
         *c. Reinstatement versus front pay* . . . . . . . . . . . . . . . 31
            *i. Reinstatement* . . . . . . . . . . . . . . . . . . . . . . . 32
            *ii. Front pay* . . . . . . . . . . . . . . . . . . . . . . . . . 35

          *iii.*     *Calculation of front pay* . . . . . . . . . . . . . . . 42
    *d.*     *Liquidated damages* . . . . . . . . . . . . . . . . . . . . 47
    *e.*     *Liquidated damages: front pay* . . . . . . . . . . . . . . . 47
    *f.*     *Punitive damages* . . . . . . . . . . . . . . . . . . . . . . . 48
    *g.*     *Interest* . . . . . . . . . . . . . . . . . . . . . . . . . . . . 50

***III. CONCLUSION AND ORDER FOR JUDGMENT*** . . . . . . . . . . . . . . . . . . 51

May an employer lawfully fire an employee who is on short term medical leave for depression without considering whether the employee's leave was protected by the FMLA? This case presents that question. It also presents a corollary question, is the employee's ability to return to work considered in light of her job at the time she took her leave or in light of the job to which the employer transferred her while she was on leave?

## *I. INTRODUCTION*

### *A. Procedural Background*

On July 1, 2009, plaintiff Christine Dollar filed her Complaint against defendants Smithway Motor Xpress, Inc. and Smithway Motor Xpress Corp. (collectively "SMX"). In Count I, Dollar contends that SMX interfered with her right to take leave under the Family and Medical Leave Act of 1993 ("FMLA"), 29 U.S.C. §§ 2601-2654, and that her termination was in retaliation for her exercising her rights under the FMLA. In Count II, Dollar asserts an Iowa common law claim that she was wrongfully discharged in

violation of Iowa public policy for seeking leave she was entitled to under the FMLA. SMX filed a timely answer to Dollar's Complaint denying these allegations.

In July, both parties filed motions for summary judgment limited to Dollar's FMLA claims. After timely resistances, I denied the cross-motions for summary judgment. I heard this case in a bench trial on March 28, 2011. At the start of the trial, Dollar withdrew her Iowa common law claim. Plaintiff Dollar was represented by John P. Roehrick of Gaudineer, Comito & George, L.L.P., Des Moines, Iowa. Defendant SMX was represented by Isham B. Bradley, Nashville, Tennessee.

## B. Findings Of Fact

Defendant SMX is a national over-the-road trucking carrier. Its principal place of business was previously in Fort Dodge, Iowa.[1] Plaintiff Christine Ann Dollar lives in Fort Dodge, Iowa, and was 48 years old at the time of trial. She did not graduate from high school, but did obtain a General Education Degree ("GED"). After obtaining her GED, she attended Iowa Central Community College and obtained an Associate of Arts degree. After finishing her Associate of Arts degree, she attended Buena Vista University

---

[1] Since the events giving rise to this lawsuit, SMX has been purchased by Western Express, Inc. ("Western Express") and its base of operations has been moved to Tennessee. Western Express, however, has not been named as a defendant in this case and no evidence was presented at trial concerning the specific details of Western Express's purchase of SMX. The issue of whether Western Express has successor liability for the actions of SMX is not before me. For the sake of simplicity, I will refer to both the predecessor and successor corporations as SMX. Currently, SMX maintains some operations at its Fort Dodge facility.

in Fort Dodge working on a Bachelor of Arts degree in psychology with a minor in criminology.[2] Dollar has a long history of suffering from depression. She was first diagnosed with depression when she was around 23 years old. Dollar was employed by SMX on two occasions.

SMX provides a handbook to its non-driver employees, such as Dollar, which explains various employee benefits and its employment policies and requirements. The handbook states that employees with less than three years of employment receive one week of vacation a year. It also contains the following explanation of SMX's "Pay Continuation for Illness or Disability":

> On your employment date, you will be allocated forty-eight (48) days in a pay continuation bank established for you. The days in this bank are for you to use when you have an illness or disability that causes you to be absent from work for a day or more. (This policy will be administered in conjunction with the General Medical Leave and Family and Medical Leave policies.)
>
> This pay continuation bank will be replenished at each January 1 of the following calendar year at the rate of up to twelve (12) days. (There can be no more than 48 days in the bank at the beginning of each calendar year.)
>
> You must be employed six (6) months before you will be eligible to use pay continuation. You will not be paid for unused pay continuation at termination.

Plaintiff's Ex. 2, Employee Handbook at 17.

SMX's employee handbook further explains an employee's ability to take unpaid leave under FMLA, providing in relevant part:

---

[2]Buena Vista University is located in Storm Lake, Iowa, but offers courses in Fort Dodge.

Under the Family and Medical Leave Act of 1993 (FMLA), eligible employees will be granted up to a total of 12 work weeks of unpaid leave during a "rolling" 12-month period for one or more of the following reasons:

. . . .

To take medical leave when the employee is unable to work because of a serious health condition.

Employees are eligible for FMLA leave when they have worked for Smithway Motor Xpress, Inc [sic] a total of at least 12 months and have worked at least 1,250 hours during the previous 12 months.

You are required to give as much notice as is practical, preferably at least thirty (30) days, of your intentions concerning family or medical leave. With respect to foreseeable medical treatments, you are to make reasonable efforts to schedule the treatments so as to not unduly disrupt the company's operations.

In situations where it is medically necessary, you may take leave intermittently or on a reduced leave schedule. You may be required to temporarily transfer to an equivalent position which better accommodates your need for recurring periods of leave.

Employees must first exhaust accrued paid leave (sick or vacation) before utilizing unpaid FMLA leave.

Medical certification will be required when leave is taken based on a serious health condition and recertification will be required for any extensions, or at four week intervals, whichever is sooner.

You will be expected to report periodically (at least every 2 weeks) on the status of your leave and your intention to return to work.

. . . .

You will be required to provide a certification to resume work before you return to work from any leave based on your own serious health condition.

. . . .

Service time with the Company shall continue during the leave and every effort will be made to reinstate you to the same position or, if unable to do so, one of equal status at the same rate of pay upon returning to work. Limitations for benefits and pay practices during leaves of absences apply here.

Plaintiff's Ex. 2, Employee Handbook at 23-24.

Dollar was first employed by SMX in the fall of 1989. At that time, SMX had two divisions: the Van Division and the Flatbed Division. She was hired to work in the dispatch department as a billing clerk for the Flatbed Division. In her position as a billing clerk, Dollar was responsible for providing billing for drivers' bills of lading for a gypsum mill client. Beginning in January of 1998, Dollar suffered a bad bout of depression, and used up all 48 days of her banked sick leave. Dollar returned to work at SMX for a short period of time, then quit, after nearly nine years with SMX, to move to Georgia.

Dollar moved back to Iowa, and returned to work at SMX on March 22, 2006. Dollar again worked in the dispatch department, but as a load coordinator in SMX's Van Division, the only position available when Dollar applied. As a load coordinator, Dollar's primary responsibility was working with SMX's customers to obtain loads for drivers in her designated geographic area. She was paid a salary of $600 per week initially plus

You will be expected to report periodically (at least every 2 weeks) on the status of your leave and your intention to return to work.

. . . .

You will be required to provide a certification to resume work before you return to work from any leave based on your own serious health condition.

. . . .

Service time with the Company shall continue during the leave and every effort will be made to reinstate you to the same position or, if unable to do so, one of equal status at the same rate of pay upon returning to work. Limitations for benefits and pay practices during leaves of absences apply here.

Plaintiff's Ex. 2, Employee Handbook at 23-24.

Dollar was first employed by SMX in the fall of 1989. At that time, SMX had two divisions: the Van Division and the Flatbed Division. She was hired to work in the dispatch department as a billing clerk for the Flatbed Division. In her position as a billing clerk, Dollar was responsible for providing billing for drivers' bills of lading for a gypsum mill client. Beginning in January of 1998, Dollar suffered a bad bout of depression, and used up all 48 days of her banked sick leave. Dollar returned to work at SMX for a short period of time, then quit, after nearly nine years with SMX, to move to Georgia.

Dollar moved back to Iowa, and returned to work at SMX on March 22, 2006. Dollar again worked in the dispatch department, but as a load coordinator in SMX's Van Division, the only position available when Dollar applied. As a load coordinator, Dollar's primary responsibility was working with SMX's customers to obtain loads for drivers in her designated geographic area. She was paid a salary of $600 per week initially plus

benefits that included health, dental, and vision insurance. Dollar's immediate supervisor in the Van Division was Terry Wieland.

Dollar missed work on August 10, 2006, and August 11, 2006. After which, on August 23, 2006, Dollar was orally reprimanded by Wieland for her absenteeism. That same day, Wieland emailed Dollar a memorandum which summarized their conversation. In his memorandum, Wieland states:

> I talked to Chris Dollar this morning about her absences. She explained the first time she was sick, 052506, she had a sinus infection. The second time she was sick, 081006 and 081106, she had problems with her depression medication. I explained to her that when I hired her I made the comment that I needed someone that was here everyday and was on top of his or her game. I explained to her also that when one person is gone it stresses the entire system. She said she was sorry but because she hadn't taken her depression medication in a number of days, the reason she stated was because of the cost, that is [sic] threw her off and she didn't feel up to the challenge of work. This was the first time I knew anything about any depression medication. I explained to Chris that we paid her for the time off even though she did not have the time coming but if we had another absence before the end of the year we would not pay her for the time.

Plaintiff's Ex. 1C, Memorandum at 1.

On September 21, 2006, Dollar had her six month job performance evaluation. Although the issue of her work attendance was noted, her work performance was found to be acceptable and she received a $25 a week raise in pay.

In December 2006, after working in the Van Division for nine months, Dollar was transferred to SMX's Flatbed Division as a driver manager. Dollar sought this transfer because she would enjoy work more if she was again in the Flatbed Division and having more contact with drivers. Todd Bird and Al Kellett became Dollar's supervisors. Bird

was her direct supervisor and Kellett, as operations manager, was above Bird. As a driver manager, Dollar's duties were the opposite of her prior position as a load coordinator. She worked primarily with drivers, ensuring that they had loads to haul, overseeing their bills of lading, and checking their log books. As Dollar described it at trial, "you are a complete baby-sitter for drivers basically." Dollar was responsible for supervising 35 to 40 truck drivers. Dollar worked from 7:00 a.m. to 5:00 p.m. five days a week and rotated working on Saturdays.

Early in 2007, Dollar was suffering from depression, anxiety, and severe insomnia. Dollar was absent from work on March 8, for half a day on March 14, and for full days on March 15 and 16, 2007. On one occasion, Dollar suffered a severe anxiety attack at work, causing her to not return from her dinner break. Dollar provided medical excuses from her doctor for her absences on March 14th, 15th, and 16th. Dollar's direct supervisor, Bird, spoke to her about her absences but Dollar was not disciplined.

On March 29, 2007, Dollar had her annual job performance evaluation with Kellett. In his evaluation, Kellett referred to Dollar's absenteeism and indicated that her attendance was "Below Expectations." Plaintiff's Ex. 1B, Performance Review at 2. He also indicated that her productivity was "Below Expectations", noting that:

> Chris does a good job when she is here  Her position demands consistancy [sic] in attendance  Drivers Customers as well as office staff depend on her being an everyday player  Failure to be here everyday results in negative productivity for all[.]

Plaintiff's Ex. 1B, Performance Review at 2.

During the evaluation, Kellett mentioned the possibility of transferring Dollar to a different position, permitting her to fill her "niche" by working with drivers. This portion of their conversation was memorialized as follows in Kellett's evaluation:

> Chris need [sic] to be an every day player and for the most part
> she has  We cannot afford to take excessive time off  Has had
> an issue recently and cannot afford additional issues of this type
> and remain in the Driver Manager Position  We have been in
> contact with HR to discuss options of a different position
> working with drivers [.]

Plaintiff's Ex. 1B, Performance Review at 4.  Dollar's overall work performance was acceptable and she received a $25 a week raise.  After her raise, Dollar's salary was $650 per week.

On June 10, 2007, Dollar was at her sister's house for their mother's birthday. Dollar's depression, anxiety, and insomnia were so severe that night that she had a friend, Sandy Mercer, and Mercer's daughter, Kyla, drive her to the emergency room at Trinity Regional Hospital in Fort Dodge.  Dollar sought admission to the hospital's psychiatric ward.  At the hospital, Dollar was examined and told that she was ineligible for hospitalization since she was neither suicidal nor threatening to harm another person.  She was given a prescription for Ambien to help her sleep, and told to contact the mental health center the following day.

On June 11, 2007, before Dollar's work shift started at 7:00 a.m., she called her supervisor, Kellett, and left a voice mail message explaining that she would not be at work, that she was going to the doctor.  Dollar then went to the North Central Iowa Mental Health Center and was seen by James B. Burr, a licensed mental health counselor.  Dollar was diagnosed with depression, taken off the depression medications previously prescribed by Dr. Burkett, and put on different medications for her depression.  Burr wrote her a medical excuse which stated:  "Christine Dollar is being seen at the Mental Health Center for depression.  She should stay off work through Tuesday June 19th."  Plaintiff's Ex. 3, Medical excuse note at 1.  The next day, Dollar left Kellett a voice mail message that she had been to the mental health clinic and received a medical excuse to be off work until June

19th. Dollar spoke by telephone to Kellett once between June 12th, and June 19th, when Kellett called Dollar on either June 13th or June 14th. During that conversation, Kellett told Dollar that she was no longer going to be working in the Flatbed Division as a driver manager and that Tom Nelson, SMX's Vice President of Human Resources and Safety, had another position in the company for her. Kellett, however, did not know the title or any specifics about the new position. Kellett also told Dollar that Nelson was on vacation that week but that Nelson was expecting her to be back at work on June 25th.

On June 19th, Dollar was seen at the Mental Health Center by Dr. Lee Berryhill, a psychiatrist. Dr. Berryhill advised Dollar to continue on the new medications prescribed to her on June 11th. Dr. Berryhill did not believe that Dollar was ready to return to work and gave her a medical excuse which stated: "Ms[.] Dollar is to remain on sick leave until July 9, 2007." Plaintiff's Ex. 4, Medical excuse note at 1. The following day, Dollar's father died. His funeral was scheduled for Monday, June 25th, the same day Dollar was expected back at work. On the morning of June 25th, Dollar called SMX and spoke to Nelson about her father's death. Nelson told Dollar that, after three or four days for bereavement leave, she would be expected to return to work on June 29th, and that her new position with SMX would be as a driver recruiter.[3] At this point, Dollar told Nelson about Dr. Berryhill's medical excuse to be off work until July 9th. Nelson told Dollar that if she couldn't come back to work until then, he could not guarantee she would have a job at SMX.

The following day, Dollar went to SMX with a friend, Karen Bryne, in order to drop off her two medical excuses. Dollar and Bryne met with Nelson and Dollar gave him her two medical releases. Nelson told Dollar that he needed to fill the driver recruiter position

---

[3]The driver recruiter position has the same pay, hours, and benefits as the driver manager position.

and that, if she could not return to work immediately, he could not guarantee she would have a job at SMX. In response, Dollar told Nelson that she was not ready to return to work. Dollar also told Nelson that she had a medical appointment on July 3rd, with Diann Crane, an Advanced Registered Practical Nurse, at Trinity Regional Medical Center. Nelson told Dollar to contact him after that appointment and he would let her know if she still had a job at SMX.

On the morning of July 3rd, Dollar realized that, since her medical appointment was not until 4:30 p.m., she might not be back from the appointment in time to call Nelson during business hours. Dollar telephoned Nelson and explained. Nelson told Dollar that he was going to be off work on July 4th and July 5th, but that she should call him after her medical appointment and leave him a voice mail message. Later that day, Dollar was seen by Crane. Dollar told Crane that she did not feel any better and did not think she was getting any results from the new medications. Crane prescribed a new medication for Dollar. Crane also gave Dollar a medical excuse addressed to Nelson which stated: "Please excuse Christine from work until 7-30-2007. She is not ready to return to work on July 9, 2007." Plaintiff's Ex. 8, Medical excuse note at 1.

On July 5th, Dollar mailed Crane's medical excuse to Nelson. The following day, Dollar called Nelson to inquire whether he had received it. Nelson told Dollar that he had received it but that it didn't make any difference. In response, Dollar told Nelson that she still was not ready to return to work. Nelson responded that he needed to fill the driver recruiter position immediately and could not hold it until July 30th. Dollar then asked Nelson if he was firing her, he replied yes.

At the time she was fired, Dollar had been employed by SMX for over twelve months and had worked at least 1,250 hours during the preceding year. Dollar had missed 24 and one-half days of work during 2007. She had not exhausted her 48 banked days of

sick leave. Nelson never offered Dollar FMLA leave nor informed her of her FMLA rights prior to terminating her. SMX did not request medical certification from Dollar under the FMLA before firing her.

On August 1, 2007, Dollar received a release to return to work from Crane which stated: "Christine is released to go back to work without restriction as of today." Plaintiff's Ex. 12 at 4, Medical release note at 1. Dollar never applied for employment with SMX after her termination on July 6, 2007. Dollar did not believe that SMX would re-employ her since she had just been fired. Dollar was never told by Nelson that she was a valued employee and the company wanted her back after she could resume working. At the time of her firing, SMX had approximately 130 non-driver employees at its Fort Dodge facility.[4] SMX currently has approximately 30 to 40 non-driver employees at its Fort Dodge facility, including five or six driver recruiters.[5]

On July 6th, the date of her termination, if Dollar had been able to return to work, she would have held the position of driver recruiter. Although Dollar had never worked in the driver recruiter position, she is aware of the basic requirements of that position. As of August 1, 2007, Dollar could have handled the stress and other job requirements of the driver recruiter position but not the stress of the driver manager position.

Following her termination, Dollar applied for unemployment compensation benefits. SMX filed an objection, contending that she was disqualified from benefits because she was discharged for misconduct. Specifically, SMX contended that Dollar had "Missed 28 days

---

[4]The 130 employee figure is drawn from Nelson's testimony. Bird testified that the number of non-drivers at SMX's Fort Dodge Facility was approximately 200. I find that because Nelson worked in human resources he was in a better position to know the size of SMX's workforce and, therefore, accept his figure.

[5]At the time of her firing, there were only four or five driver recruiters at SMX's Fort Dodge facility.

of YTD work + would not return." Plaintiff's Ex. 12 at 7, Notice of Claim at 1.   Dollar was initially denied unemployment compensation benefits, but not because her actions constituted misconduct.   Rather, she was denied benefits because she was found unable to perform work due to her illness.   After Dollar received her release to return to work, Dollar was found to be qualified to receive unemployment compensation benefits.   She received such benefits during two periods:   from August 2007 until the end of January 2008, and July 2008 until October 2008.   Dollar was required to apply for employment at at least two locations each week while she was receiving unemployment compensation benefits.   During this time, Dollar also visited and provided care to her mother, who was suffering from a terminal illness.   In October 2008, Dollar's unemployment compensation benefits stopped with her new employment as a part-time front desk clerk at a Days Inn in Fort Dodge.   Dollar worked at the Days Inn for approximately two months before obtaining a full-time position at a Budget Host Inn in Fort Dodge as a front desk clerk and night auditor.   Dollar is still employed in that position.   She earns $10.00 per hour and works 48 hours per week.   In 2009, Dollar earned $21,344 in her position.   Dollar's current job does not provide any benefits.

## II.  LEGAL ANALYSIS

In her complaint, Dollar alleges both retaliation and interference claims under the FMLA.  *See Stallings v. Hussmann Corp.*, 447 F.3d 1041, 1050 (8th Cir. 2006) (noting two types of claims "under the FMLA:  (1) 'interference' or '(a)(1)' claims in which the employee alleges that an employer denied or interfered with his substantive rights under the FMLA and (2) 'retaliation' or '(a)(2)' claims in which the employee alleges that the employer discriminated against him for exercising his FMLA rights." (citing 29 U.S.C.

§ 2615(a)(1)-(2))).  Because Dollar's remaining claims are based exclusively on the FMLA, a brief overview of that act is necessary.

## A.  Overview of the FMLA

The FMLA was created to "balance the demands of the workplace with the needs of families, to promote the stability and economic security of families, and to promote national interests in preserving family integrity." 29 U.S.C. § 2601(b)(1).  The FMLA "entitles eligible employees to take a total of twelve weeks of leave during a twelve-month period due to 'a serious health condition that makes the employee unable to perform the functions of the position of such employee.'"  *Throneberry v. McGehee Desha County Hosp.*, 403 F.3d 972, 977 (8th Cir. 2005) (quoting 29 U.S.C. § 2612(a)(1)(D)); *see Murphy v. FedEx Nat'l LTL, Inc.*, 618 F.3d 893, 898 (8th Cir. 2010); *Estrada v. Cypress Semiconductor, Inc.*, 616 F.3d 866, 871 (8th Cir. 2010); *Scobey v. Nucor Steel-Ark.*, 580 F.3d 781, 785 (8th Cir. 2009); *Rask v. Fresenius Med. Care N. Am.*, 509 F.3d 466, 471 (8th Cir. 2007).[6] Under the FMLA, a "serious health condition" is defined as "'any 'illness, injury, impairment, or physical or mental condition that involves (A) inpatient care in a hospital, hospice, or residential medical care facility; or (B) continuing treatment by a health care provider.'"  *Murphy*, 618 F.3d at 898 (quoting 29 U.S.C. § 2611(11)); *see Scobey*, 580 F.3d at 785; *Phillips v. Mathews,* 547 F.3d 905, 909 (8th Cir. 2008).  Furthermore, "[w]hen an employee completes her FMLA leave, she is generally entitled to be restored

---

[6]In addition to allowing leave due to an employee's own serious medical condition, the FMLA permits employees to take leave for any of the following additional reasons: (1) the birth of the employee's child; (2) "[t]he placement with the employee of a son or daughter for adoption or foster care, and to care for the newly placed child"; or (3) to care for the employee's spouse, child, or parent suffering from a serious health condition.  29 C.F.R. § 825.200 (1995).

to the position she occupied before she took leave." *Throneberry*, 403 F.3d at 977 (citing 29 U.S.C. § 2614(a)(1));*see Darby v. Bratch*, 287 F.3d 673, 679 (8th Cir. 2002) ("'[U]pon return from FMLA leave, employees are entitled to reinstatement to the same or an equivalent position without the loss of benefits . . . .'") (quoting *Spangler v. Federal Home Loan Bank of Des Moines*, 278 F.3d 847, 851 (8th Cir. 2002)).

Because the FMLA grants valuable leave and restoration rights to eligible employees, it also secures these rights against unlawful infringement by prohibiting employers from discriminating against employees for exercising their rights to take FMLA leave. *See Rask*, 509 F.3d at 471; *Stallings*, 447 F.3d at 1051; *Smith v. Allen Health Sys., Inc.*, 302 F.3d 827, 832 (8th Cir. 2002). Specifically, the act makes it "unlawful for any employer to interfere with, restrain, or deny the exercise of or the attempt to exercise, any right provided under" the FMLA. 29 U.S.C. § 2615(a)(1). As the Eighth Circuit Court of Appeals has explained:

> "[t]here are two types of claims under the FMLA: (1) 'interference' or '(a) (1)' claims in which the employee alleges that an employer denied or interfered with his substantive rights under the FMLA and (2) 'retaliation' or '(a)(2)' claims in which the employee alleges that the employer discriminated against him for exercising his FMLA rights.

*Scobey*, 580 F.3d at 785 (quoting *Phillips,* 547 F.3d at 909-10); *see Estrada*, 616 F.3d at 871. The court of appeals has recognized that "[c]onfusion often arises as to whether an employee's FMLA claim 'is really about interference with his substantive rights, not discrimination or retaliation.'" *Stallings*, 447 F.3d at 1051 (quoting *Kauffman v. Fed. Express Corp.,* 426 F.3d 880, 884 (7th Cir. 2005)). "'The difference between the two claims is that the interference claim merely requires proof that the employer denied the employee his entitlements under the FMLA, while the retaliation claim requires proof of retaliatory intent.'" *Wisbey v. City of Lincoln*, 612 F.3d 667, 675 (8th Cir. 2010) (quoting

*Stallings*, 447 F.3d at 1051). Another difference between an interference and a retaliation claim is that retaliation claims are analyzed using the burden-shifting framework in *McDonnell Douglas Corp. v. Green,* 411 U.S. 792, 802 (1973). *See Phillips v. Mathews,* 547 F.3d 905, 912 (8th Cir. 2008) ("Because Phillips does not have direct evidence of retaliation, we analyze her FMLA retaliation claim under the *McDonnell Douglas* burden-shifting framework."). The Eighth Circuit Court of Appeals has specifically rejected using the *McDonnell Douglas* burden-shifting framework when analyzing an interference claim under the FMLA. *See Stallings*, 447 F.3d at 1051 n.3; *Rankin v. Seagate Tech., Inc.,* 246 F.3d 1145, 1148 (8th Cir. 2001). As the court of appeals explained in *Stallings*:

> In an interference claim, an "employee must show only that he or she was entitled to the benefit denied." *Russell v. N. Broward Hosp.,* 346 F.3d 1335, 1340 (11th Cir. 2003) (stating that the burden to establish an interference claim is less than that of a retaliation claim, which requires a showing that the employer's actions were motivated by an impermissible retaliatory animus). This court has recognized that an employee can prove interference with an FMLA right regardless of the employer's intent. *Throneberry* [ *v. McGehee Desha County Hosp.*], 403 F.3d [972,] 979 [ (8th Cir. 2005)]. An employee can prevail under an interference theory if he was denied substantive rights under the FMLA for a reason connected with his FMLA leave. *Id.* "[E]very discharge of an employee while [he] is taking FMLA leave interferes with an employee's FMLA rights. However, the mere fact of discharge *during* FMLA leave by no means demands an employer be held strictly liable for violating the FMLA's prohibition of interfering with an employee's FMLA rights." *Id.* at 980 (emphasis added). Thus, where an employer's reason for dismissal is insufficiently related to FMLA leave, the reason will not support the employee's recovery. *Id.* at 979 (holding that strict liability does not apply to an (a)(1) claim).

*Stallings*, 447 F.3d at 1051 (footnote omitted).

Keeping this in mind, I turn to Dollar's FMLA claims.

## B. Dollar's FMLA Claims

### 1. Dollar's FMLA retaliation claim

Although Dollar has alleged both retaliation and interference claims under the FMLA, it is now clear, following trial, that Dollar's FMLA claims are fundamentally premised on an interference theory, and not a theory of retaliation. "Confusion often arises as to whether an employee's FMLA claim 'is really about interference with his substantive rights, not discrimination or retaliation.'" *Stallings*, 447 F.3d at 1051 (quoting *Kauffman v. Fed. Express Corp.*, 426 F.3d 880, 884 (7th Cir. 2005)). In *Stallings*, the Eighth Circuit Court of Appeals determined that the plaintiff's claim was not really an interference claim, but "fundamentally a claim for retaliation and should be analyzed as such." *Id.* Centrally important to its decision was the fact that the plaintiff "received all of the FMLA leave he requested," and that the employer "[n]ever impeded [plaintiff's] use of FMLA leave." *Id.* In other words, the plaintiff exercised his rights under the FMLA by taking leave, but then was allegedly retaliated against for doing so. In this case, the opposite occurred: SMX never offered Dollar FMLA leave, and Dollar never requested or took any FMLA leave. Therefore, Dollar did not exercise any right to FMLA leave on July 6th and no leave resulted. *See* 29 C.F.R. § 825.220(c) ("An employer is prohibited from discriminating against employees or prospective employees *who have used FMLA leave*." (emphasis added)); *Stallings*, 447 F.3d at 1051 ("The FMLA prohibits employers from discriminating against an employee *for asserting his rights* under the Act." (emphasis added)).[7]    Dollar

---

[7]Although significant amendments to the FMLA regulations became effective on January 16, 2009, *see Scobey*, 580 F.3d at 785, 785 n.2, 788, 788 n.5, because the events

(continued...)

has not shown, or even claimed, that she took qualifying FMLA leave. Thus, Dollar's retaliation claim fails. *See Smith v. Allen Health Sys., Inc.*, 302 F.3d 827, 832 (8th Cir. 2002) (requiring a plaintiff to "exercise[] rights afforded by the Act," and to show "that there was a causal connection between [his] exercise of rights and the adverse employment action."). I find her FMLA claim is "fundamentally a claim for [interference] and should be analyzed as such." *Stallings*, 447 F.3d at 1051; *compare* 29 U.S.C. § 2615(a)(1) (prohibiting interference with "the exercise or the attempt to exercise" FMLA rights), *with id.* § 2615(a)(2) (prohibiting the retaliation of an individual for that individual's "opposing any practice made unlawful" by the FMLA). As a result, I deny Dollar's claim for retaliation, and proceed to analyze her interference FMLA claim. Indeed, under the same facts, interference is easier prove than retaliation. *See Russell v. N. Broward Hosp.*, 346 F.3d 1335, 1340 (11th Cir. 2003) (noting an interference theory is "more employee-friendly").

### 2.    *Dollar's FMLA Interference Claim*

Under the FMLA, "[a]n employer is prohibited from interfering with, restraining, or denying an employee's exercise of or attempted exercise of any right contained in the FMLA." *Stallings*, 447 F.3d at 1050 (citing 29 U.S.C. § 2615(a)(1)).

> Interference includes "not only refusing to authorize FMLA leave, but discouraging an employee from using such leave. It would also include manipulation by a covered employer to avoid responsibilities under FMLA." An employer's action that deters an employee from participating in protected

---

[7](…continued)

and this lawsuit occurred in 2007, I will consider and apply the 1995 regulations in this case. *See Bowen v. Georgetown Univ. Hosp.*, 488 U.S. 204, 208 (1988) (holding that regulations cannot be applied retroactively unless the power to promulgate retroactive rules "is conveyed by Congress in express terms.").

> activities constitutes an "interference" or "restraint" of the employee's exercise of his rights.

*Id.* (citations omitted). As noted earlier, the FMLA requires that, upon completion of twelve weeks leave, the employee be restored to the same or an equivalent position, 26 U.S.C. § 2614(a). Here, Dollar alleges that SMX interfered with her right to reinstatement. In order to establish her interference claim, Dollar must prove each of the following five elements:

> "1) [Dollar] was an "[e]ligible employee," 29 U.S.C. § 2611(2); 2) [SMX] was an "[e]mployer," 29 U.S.C. § 2611(4); 3) [Dollar] was entitled to FMLA leave, 29 U.S.C. § 2612(a)(1); 4) [Dollar] gave [SMX] notice of her intent to take FMLA leave, 29 U.S.C. § 2612(e)(1); and 5) [SMX] denied [Dollar's] FMLA benefits to which she was entitled. *Wysong v. Dow Chem. Co.*, 503 F.3d 441, 447 (6th Cir.2007) (citing *Cavin v. Honda of Am. Mfg., Inc.*, 346 F.3d 713, 719 (6th Cir.2003))"

*Beekman v. Nestle Purina Petcare Co.*, 635 F. Supp.2d 893, 909 (N.D. Iowa 2009) (quoting *Schoonover v. ADM Corn Processing*, 2008 WL 282343, at *12 (N.D. Iowa 2008)); *see Beatty v. Custom-Pak, Inc.*, 624 F. Supp.2d 1045, 1052 (S.D. Iowa 2009).

### a. *Eligible employee and employer*

Here, Dollar qualifies as an eligible employee since SMX employed her for over twelve months and she worked for at least 1,250 hours in that time. *See* 29 U.S.C. § 2611(2)(A); 29 C.F.R. § 825.110 (1995). SMX qualifies as an employer under the FMLA because it was a business that employed fifty or more employees for each working day during each of twenty or more calendar workweeks in the current or preceding calendar year. *See* 29 C.F.R. § 825.104 (1995).

### b. *Serious health condition*

As previously noted, the FMLA defines "serious health condition" as follows:

> The term "serious health condition" means an illness, injury,
> impairment, or physical or mental condition that involves--
>> (A) inpatient care in a hospital, hospice, or residential
>> medical care facility; or
>> (B) continuing treatment by a health care provider.

29 U.S.C. § 2611(11).  No evidence was offered at trial that Dollar ever received inpatient care for her depression.  Thus, her depression fails to satisfy the requirements of 29 U.S.C. § 2611(11)(A).  As a result, whether her depression qualifies as a "serious health condition" turns on whether it constitutes "an illness, injury, impairment, or physical or mental condition that involves . . . continuing treatment by a health care provider."  29 U.S.C. § 2611(11).

The United States Department of Labor's administrative regulations provide a more detailed explanation of what qualifies as a "serious health condition" involving continuing treatment under the FMLA:

> (a) For purposes of FMLA, "serious health condition"
> entitling an employee to FMLA leave means an illness, injury,
> impairment, or physical or mental condition that involves:
>> . . . .
> (2) *Continuing treatment* by a health care provider.  A
> serious health condition involving continuing treatment by a
> health care provider includes any one or more of the following:
> (i) A period of incapacity (i.e., inability to work, attend school
> or perform other regular activities due to a serious health
> condition, treatment thereof, or recovery therefrom) of more
> than three consecutive calendar days, and any subsequent
> treatment or period of incapacity relating to the same condition,
> that also involves:
>> (A) Treatment two or more times by a health care
>> provider . . . or
>> (B) Treatment by a health care provider on at least one
>> occasion which results in a regimen of continuing treatment
>> under the supervision of the health care provider.

. . . .

(iii) Any period of incapacity or treatment for such incapacity due to a chronic serious health condition. A chronic serious health condition is one which:

(A) Requires periodic visits for treatment by a health care provider . . .;

(B) Continues over an extended period of time . . .; and

(C) May cause episodic rather than a continuing period of incapacity (e.g., asthma, diabetes, epilepsy, etc.)

. . . .

(v) Any period of absence to receive multiple treatments (including any period of recovery therefrom) by a health care provider or by a provider of health care services under orders of, or on referral by, a health care provider, either for restorative surgery after an accident or other injury, or for a condition that would likely result in a period of incapacity of more than three consecutive calendar days in the absence of medical intervention or treatment, such as cancer (chemotherapy, radiation, etc.), severe arthritis (physical therapy), kidney disease (dialysis).

(b) Treatment for the purposes of paragraph (a) of this section includes (but is not limited to) examinations to determine if a serious health condition exists and evaluations of the condition. Treatment does not include routine physical examinations. . . Under paragraph (a)(2)(i)(B), a regimen of continuing treatment includes, for example, a course of prescription medication (e.g., an antibiotic) or therapy requiring special equipment to resolve or alleviate the health condition (e.g., oxygen). A regimen of continuing treatment that includes … activities that can be initiated without a visit to a health care provider, is not, by itself, sufficient to constitute a regimen of continuing treatment for purposes of FMLA leave.

. . . .

(e) Absences attributable to incapacity under paragraphs (a)(2)(ii) or (iii) qualify for FMLA leave even though the employee . . . does not receive treatment from a health care provider during the absence, and even if the absence does not

> last more than three days. For example, an employee with
> asthma may be unable to report for work due to the onset of an
> asthma attack or because the employee's health care provider
> has advised the employee to stay home when the pollen count
> exceeds a certain level.

29 C.F.R. § 825.114 (1995).

The Eighth Circuit Court of Appeals has applied these regulations and found that "the continuing treatment test for a serious health condition is met if the employee is incapacitated by an illness, injury, impairment, or physical or mental condition for more than three consecutive days and for which he is treated by a health care provider on two or more occasions." *Woods,* 409 F.3d at 990.

On June 10, 2007, Dollar went to the emergency room at Trinity Regional Medical Center and sought admission to the hospital's psychiatric ward. At the hospital, Dollar was examined, given a prescription for Ambien to help her sleep, and told to contact the mental health center the following day. On June 11th, Dollar was seen at the mental health center by Burr, a licensed mental health counselor, who diagnosed her with depression, and excused her from work for the following week. On June 19th, Dollar was treated by Dr. Berryhill, a psychiatrist. After his examination, Dr. Berryhill further excused Dollar from work until July 9th. On July 3rd, Dollar was seen by Crane, an Advanced Registered Practical Nurse, at Trinity Regional Medical Center. Crane prescribed a new medication for Dollar and gave her a medical excuse to be absent from work until July 30th. Given this evidence, I have no difficulty finding that Dollar was suffering from a "serious health condition."

### c.     *Notice*

Under the FMLA, employees "'have an affirmative duty to indicate both the need and the reason for the leave, and must let employers know when they anticipate returning

to their position.'" *Scobey*, 580 F.3d at 786 (quoting *Woods*, 409 F.3d at 990-91) (quotation omitted)). As the Eighth Circuit Court of Appeals explained in *Murphy*:

> Notice, as the FMLA requires, means that an employee must provide her employer with "enough information to show that [s]he may need FMLA leave." *Woods*, 409 F.3d at 990. While the employee is not required to invoke the FMLA by name, the employee must provide "information to suggest that h[er] health condition could be serious." *Id*.
>
> Our cases instruct that the adequacy of an employee's notice requires consideration of the totality of the circumstances, *e.g., Scobey*, 580 F.3d at 787, and is typically a jury question, *Phillips*, 547 F.3d at 909.

*Murphy*, 618 F.3d at 903. The court of appeals has further explained that:

> "The employer must be made aware that the absence is due to a serious illness so the employer can distinguish it from ordinary 'sick-days,' or even malingering, as a type of unusual and privileged absence." *Rask*, 509 F.3d at 472. "To hold otherwise would create an unreasonable burden for employers, requiring them to investigate virtually every absence to ensure that it does not qualify for FMLA leave." *Id*.

*Scobey*, 580 F.3d at 786; *see Browning v. Liberty Mut. Ins. Co.*, 178 F.3d 1043, 1049 (8th Cir. 1999) (holding that under the FMLA, employer's duties are triggered when employee provides enough information to put employer on notice that employee may be in need of FMLA); *Hammon v. DHL Airways, Inc.*, 165 F.3d 441, 451 (6th Cir. 1999) ("[A]n employee gives his employer sufficient notice that he is requesting leave for an FMLA-qualifying condition when he gives the employer enough information for the employer to reasonably conclude that an event described in [the FMLA] has occurred."); *see also* 29 C.F.R. §§ 825.302(c) (1995) ("The employee need not expressly assert rights under the FMLA or even mention the FMLA, but may only state that leave is needed."); 29 C.F.R.

§ 825.303(b) (1995) ("An employee need not mention the FMLA by name in order to invoke its protections; the employee need only make the employer aware that leave is required for a purpose covered by the FMLA.").

Dollar provided SMX with more than adequate notice under the FMLA. At the time that Dollar gave SMX her first two medical excuses on June 26th, SMX was already aware that Dollar was taking medication for depression, knew she had taken leave because of her depression in the past, and knew that she needed more leave for further treatment of her depression. Considering the totality of the circumstances, Dollar has established that she put SMX on notice that she needed FMLA leave for treatment of her depression.

### d. *Denial of benefits*

Finally, I must determine whether Dollar's requested FMLA benefits were denied or otherwise interfered with. Dollar has shown that she was entitled to a benefit—FMLA leave on July 6th—and that such benefit was denied. Instead of being offered FMLA leave, Dollar was summarily fired when she explained that her current "serious health condition" prevented her from returning to work on that day. Dollar's credible and un-rebutted testimony revealed that Nelson denied her leave that day. I find that SMX interfered with Dollar's FMLA rights by "refusing to authorize FMLA leave" on July 6th. *See* 29 C.F.R. § 825.220(b).

### 3. *Remedies*

"An employer who interferes with an employee's FMLA leave 'shall be liable to any eligible employee affected' for compensatory damages and 'for such equitable relief as may be appropriate. . . .'" *Rodgers v. City of Des Moines*, 435 F.3d 904, 909 (8th Cir. 2006) (quoting 29 U.S.C. § 2617(a)(1)). The FMLA specifically provides:

> (1) Liability. Any employer who violates section 105 [29 U.S.C. § 2615] shall be liable to any eligible employee

affected-

    (A) for damages equal to-
    (i) the amount of-

        (I) any wages, salary, employment benefits, or other compensation denied or lost to such employee by reason of the violation; or
        (II) in a case in which wages, salary, employment benefits, or other compensation have not been denied or lost to the employee, any actual monetary losses sustained by the employee as a direct result of the violation, such as the cost of providing care, up to a sum equal to 12 weeks (or 26 weeks, in a case involving leave under section 102(a)(3) [29 U.S.C. § 2612(a)(3) ] ) of wages or salary for the employee;

    (ii) the interest on the amount described in clause (i) calculated at the prevailing rate; and
    (iii) an additional amount as liquidated damages equal to the sum of the amount described in clause (i) and the interest described in clause(ii), except that if an employer who has violated section 105 [29 U.S.C. § 2615] proves to the satisfaction of the court that the act or omission which violated section 105 [29 U.S.C. § 2615] was in good faith and that the employer had reasonable grounds for believing that the act or omission was not a violation of section 105 [29 U.S.C. § 2615], such court may, in the discretion of the court, reduce the amount of the liability to the amount and interest determined under clauses (i) and (ii), respectively; and
    (B) for such equitable relief as may be appropriate, including employment, reinstatement, and promotion.

29 U.S.C. § 2617(a)(1). "The FMLA, however, 'provides no relief unless the employee has been prejudiced by the violation,'" because "'[t]he remedy is tailored to the harm suffered.'" *Rodgers*, 435 F.3d at 909 (quoting *Ragsdale v. Wolverine World Wide, Inc.*,

535 U.S. 81, 89 (2002)).  Here, Dollar seeks both compensatory and punitive damages from SMX.  I will consider each of these damages requests in turn.

### a.    *Compensatory damages*

Initially, I take up an issue left unresolved by my summary judgment order.  An employee has no right to reinstatement-and, therefore, damages-if, at the end of her twelve-week period of leave, she is either unable or unwilling to perform the essential functions of her job.  *See* 29 C.F.R. § 825.214(b); *Colburn v. Parker Hannifin/Nichols Portland Div.,* 429 F.3d 325, 332 (1st Cir. 2005).  Here, SMX contends that Dollar has not suffered any damages as a result of its actions, because her depression rendered her unable to ever return to her position as a driver manager with SMX.  Thus, SMX argues that Dollar has suffered no loss in income or other recoverable damages under the FMLA.  Dollar argues that prior to termination, she was transferred to the position of driver recruiter and that she could have performed its duties, but was not given the opportunity because of her termination.

After returning from leave under the FMLA, an employee is entitled to be restored to her former position or to an equivalent position with equivalent benefits, pay, and other terms of employment.  29 U.S.C. § 2614.  The FMLA specifically provides:

> Except as provided in subsection (b) of this section, any eligible employee who takes leave under section 2612 of this title for the intended purpose of the leave shall be entitled, on return from such leave -
>
> (A) to be restored by the employer to the position of employment held by the employee when the leave commenced; or
>
> (B) to be restored to an equivalent position with equivalent employment benefits, pay, and other terms and conditions of employment.

26

26 U.S.C. § 2614. Regarding an equivalent position, the applicable federal regulation provides:

> (a) An equivalent position is one that is virtually identical to the employee's former position in terms of pay, benefits and working conditions, including privileges, perquisites and status. It must involve the same or substantially similar duties and responsibilities, which must entail substantially equivalent skill, effort, responsibility, and authority.

29 C.F.R. § 825.215 (1995).

I find that Dollar had been reassigned to a driver recruiter position at the time of her termination. While SMX presented evidence, in the form of Nelson's testimony, that Dollar occupied the position of driver manager at the time of her termination, I reject Nelson's testimony on this point because it is clearly contradicted by other evidence in the record. Prior to her termination, on either June 13th, or June 14th, Kellett told Dollar that she was no longer going to be working in the Flatbed Division as a driver manager and that Nelson, SMX's Vice President of Human Resources and Safety, had another position in the company for her. When Dollar subsequently spoke to Nelson, on June 25th, he confirmed what Kellett had told her, that she was no longer going to be working as a driver manager. Nelson told Dollar that, after her bereavement leave, her new position would be as a driver recruiter. No evidence was produced at trial that Dollar had the option of returning to work as a driver manager after June 13th, or June 14th. At that point, the only position available to her was as a driver recruiter. Although Dollar was fired by SMX before actually working as a driver recruiter, it is uncontested that, if Dollar had been able to return to work on July 6th, as Nelson insisted, she would have held the position of driver recruiter. I find that Dollar was a driver recruiter when she was fired. This fact is significant because

SMX failed to restore her to her former position as a driver recruiter, a position that she could have performed despite her depression. As a result, Dollar suffered economic losses.

### b. *Back pay and benefits*

Having prevailed on her FMLA interference claim, Dollar is entitled to back pay. *See* 29 U.S.C. § 2617(a)(1)(A)(i)(I); *Franzen v. Ellis Corp.*, 543 F.3d 420, 426 (7th Cir. 2008) ("An employee may be entitled to both back pay and front pay as a remedy for losses flowing from an employer's interference with his substantive rights under the FMLA. . ."). As previously noted, under the FMLA, Dollar was entitled to a total of 12 work-weeks of leave during any 12-month period "because of a serious health condition that makes the employee unable to perform the functions of the position of such employee." 29 U.S.C. § 2612(a)(1)(D). However, such leave "may consist of unpaid leave." 29 U.S.C. § 2612(c). Here, SMX paid Dollar through July 18th. Absent any evidence that Dollar would have been entitled to additional paid leave, I find that, had SMX granted her FMLA leave, leave after July 18th would have been unpaid. As a result, Dollar is not entitled to back pay for the period of July 18, 2007, through August 1, 2007, the day she was released to return to work.

Mitigation of damages is an affirmative defense. *See Sayre v. Musicland Group, Inc.,* 850 F.2d 350, 353-54 (8th Cir. 1988) (holding that mitigation is an affirmative defense that must be pleaded under Federal Rule of Civil Procedure 8(c) notwithstanding the fact it is not one of the listed affirmative defenses.). SMX, however, never pled failure to mitigate as an affirmative defense and did not explicitly argue that defense but merely suggested it in its cross-examination of Dollar, concerning the care she provided to her mother. Thus, SMX has waived this affirmative defense here. Even if SMX had not waived the defense, it has not met its burden of establishing a lack of diligence to mitigate by Dollar. "A defendant satisfies its burden only by establishing that there were

substantially equivalent positions available and that the plaintiff did not use reasonable care and diligence in seeking such positions." *Killian v. Yorozu Automotive Tenn., Inc.,* 454 F.3d 549, 556-57 (6th Cir. 2006). "'A claimant is only required to make reasonable efforts to mitigate damages, and is not held to the highest standards of diligence." *Id.* at 624 (quoting *Rasimas v. Mich. Dep't of Mental Health,* 714 F.2d 614, 623 (6th Cir. 1983)). SMX produced no evidence at trial that there were jobs available which Dollar could have discovered and for which she was qualified. To the contrary, having used reasonable diligence in her job search, I find that Dollar made a reasonable effort to mitigate her damages. Dollar, therefore, is entitled to back pay for the period of August 2, 2007, through April 13, 2011. I also find that Dollar is entitled to recover damages she sustained because of the termination of her health insurance benefits. *See Sherman v. AI/FOCS, Inc.,* 113 F. Supp. 2d 65, 76 (D. Mass. 2000). The next step is to calculate Dollar's back pay for this period.

At trial, Dollar put on evidence of her losses through economist, Dr. John P. Mattila, a retired professor of economics with over thirty years' experience. He based his calculations on Dollar's salary at the time of her termination, $650 per week, and assumed that SMX made the national average company contributions for employee health care for its share of Dollar's health insurance benefits. To calculate Dollar's lost wages for a given year, Dr. Mattila took the value of Dollar's projected SMX earnings for that year, and subtracted Dollar's actual income for that year. In order to calculate Dollar's lost SMX health insurance contributions, Dr. Mattila added the projected costs of SMX's health insurance contributions for Dollar for the period of August 2, 2007, through March 31, 2011.

SMX offered no evidence contradicting Dr. Mattila's back pay calculations, and I find no reason to question his calculations as to Dollar's lost back pay and benefits. Indeed,

I find his calculations to be prudent and quite conservative. For example, he did not use "the total offset method."[8] Thus, I accept Dr. Mattila's calculations and adopt them as my calculations of Dollar's lost back pay and benefits. I find that Dollar is entitled to back pay for the period of August 2, 2007, through April 13, 2011, based on her regular pay at SMX for that period less her income during that time. Added to this figure is Dollar's lost health care contributions. I calculate Dollar's lost back pay and benefits as follows:

| (1) Year | (2) SMX pay | (3) Post-SMX income | (4) Lost back pay (column 2 minus column 3) | (5) Lost SMX health insurance contribution | (6)Total lost back pay and benefits (column 4 added to column 5 |
|---|---|---|---|---|---|
| 2007 | 31,268 | 17,942 | 13,326 | 1,522 | 14,848 |
| 2008 | 32,206 | 3,396 | 28,810 | 3,678 | 32,488 |
| 2009 | 32,689 | 21,344 | 11,345 | 3,733 | 15,078 |
| 2010 | 33,702 | 23,316 | 10,386 | 3,849 | 14,235 |
| 2011 | 9,710 | 6,706 | 3,004 | 1,108 | 4,106 |
| Total | | | 66,871 | 13,890 | 80,793 |

[8]The "total offset method" or "Alaska method" assumes that the effect of inflation will offset the interest rate, thereby not requiring a reduction to present value. *See* William F. Landsea & David L. Roberts, *Inflation and the Present Value of Future Economic Damages*, 37 U. MIAMI L. REV. 93, 109-110 (1982). Also, Dr. Matilla reduced his front pay calculations by Dollar's probability of survival. Again a conservative approach because courts and juries would usually assume, absent evidence to the contrary, that a plaintiff would live to their normal life expectancy.

Based on the evidence presented at trial, I find that Dollar is entitled to $66,887 in back pay for this period. This sum reflects the amount of wages Dollar would have earned from her employment at SMX during this period minus the wages she has earned during the same time. I further find that Dollar is entitled to $13,900 for her lost health insurance contributions for this period. Therefore, Dollar is entitled to a total of $80,793 for back pay and loss of health insurance contributions.

### c. *Reinstatement versus front pay*

An FMLA plaintiff may also be entitled to front pay. *See* 29 U.S.C. § 2617(a)(1)(B); *McBurney v. Stew Hansen's Dodge City, Inc.*, 398 F.3d 998, 1001 n.2 (8th Cir. 2005); *see also Franzen*, 543 F.3d at 426; *Arban v. West Pub. Corp.,* 345 F.3d 390, 405 (6th Cir. 2003); *Smith v. Diffee Ford-Lincoln-Mercury, Inc.*, 298 F.3d 955, 964 (10th Coir. 2002); *Nichols v. Ashland Hosp. Corp.,* 251 F.3d 496, 503-504 (4th Cir. 2001); *Churchill v. Star Enters.,* 183 F.3d 184, 193 (3d Cir. 1999). While back pay compensates a plaintiff for lost wages and benefits before trial, front pay is intended to compensate her for losses after trial. *Smith*, 298 F.3d at 964. Reinstatement is generally preferable to an award of front pay, but front pay can be awarded where reinstatement is not feasible. *See McBurney*, 398 F.3d at 1001 n.2; *see also Downey v. Strain*, 510 F.3d 534, 544 (5th Cir. 2007); *E.E.O.C. v. E.I Du Pont de Nemours & Co.,* 480 F.3d 724, 732 (5th Cir. 2007).

In *Ogden v. Wax Works, Inc.,* 29 F. Supp. 2d 1003, 1008-15 (N.D. Iowa 1998), *aff'd,* 214 F.3d 999 (8th Cir. 2000), I comprehensively examined reinstatement and front pay as prospective equitable relief remedies under Title VII, as well as examining the factors to be considered in ordering reinstatement or in awarding front pay. *Id.* Title VII, like the FMLA, provides for back pay and front pay or reinstatement. *See* 42 U.S.C. §§ 2000e *et seq.* Although *Ogden* specifically addressed front pay damages in a Title VII action, because there is no significant difference between front pay claims under the FMLA

and Title VII, its reasoning logically extends to Dollar's FMLA claims. I, therefore, will not expound upon those remedies and factors extensively. Rather, I will address the remedies and apply the factors that I explained in *Ogden* here.

###### i.    *Reinstatement*

At trial, even though Dollar plead reinstatement in her complaint, she did not request or present any evidence on reinstatement. Instead, she presented front pay evidence through economist Dr. Mattila. Before considering Dollar's request for front pay, I need to determine if the "preferred" remedy of reinstatement is either feasible or appropriate. *See Williams. v. Valentec Kisco, Inc.,* 964 F.2d 723, 730 (8th Cir. 1992) (remanding issue of front pay and reminding magistrate judge that front pay should not be awarded "unless reinstatement is impossible or impracticable. . . .") (quoting *Wildman v. Lerner Stores Corp.,* 771 F.2d 605, 616 (1st Cir. 1985)); *see Downey*, 510 F.3d at 544; *E.I Du Pont de Nemours & Co.*, 480 F.3d at 732; *Seller v. Mineta*, 358 F.3d 1058, 1067 (8th Cir. 2004); *Salitros v. Chrysler Corp.,* 306 F.3d 562, 572 (8th Cir. 2002) (citing *Kucia v. Southeast Ark. Cmty. Action Corp.,* 284 F.3d 944, 948-49 (8th Cir. 2002)). This question is made more difficult, or perhaps easier, because no party requested, or put on any evidence of, reinstatement. Nor was reinstatement included in the final pretrial order. *See In re Net-Valazquez*, 625 F.3d 34, 40 (1st Cir. 2010) (noting that claims or defenses omitted from final pretrial order "are waived, whether or not properly raised in the pleadings."); *Pierce County Hotel Employees v. Elks Lodge,* 827 F.2d 1324, 1329 (9th Cir .1987) ("Issues not preserved in the pretrial order are eliminated from the action."). I conclude that both parties have abandoned any claim for reinstatement. Alternatively, I find reinstatement is not a viable option. In *Ogden,* I identified the following factors as potentially useful in determining whether reinstatement is appropriate:

(1) whether the employer is still in business, *Duke v. Uniroyal, Inc.,* 928 F.2d 1413, 1423 (4th Cir. 1991); (2) whether there is a comparable position available for the plaintiff to assume, *Roush v. KFC Nat'l Management Co.,* 10 F.3d 392, 398 (6th Cir. 1993), *cert. denied,* 513 U.S. 808, 115 S. Ct. 56, 130 L. Ed. 2d 15 (1994); *Duke,* 928 F.2d at 1423; (3) whether an innocent employee would be displaced by reinstatement, *Ray v. Iuka Special Mun. Separate Sch. Dist.,* 51 F.3d 1246, 1254 (5th Cir. 1995); *Roush,* 10 F.3d at 398; *McKnight v. General Motors Corp.,* 973 F.2d 1366, 1370-71 (7th Cir. 1992); (4) whether the parties agree that reinstatement is a viable remedy, *Ray,* 51 F.3d at 1254; *Roush,* 10 F.3d at 398; (5) whether the degree of hostility or animosity between the parties-caused not only by the underlying offense but also by the litigation process-would undermine reinstatement, *Cowan,* 140 F.3d at 1160; *Ray,* 51 F.3d at 1254; *Roush,* 10 F.3d at 398; *Standley,* 5 F.3d at 322; *McKnight,* 973 F.2d at 1370-71; *Lewis v. Federal Prison Indus., Inc.,* 953 F.2d 1277, 1280 (11th Cir. 1992) (citation omitted); *Duke,* 928 F.2d at 1423; (6) whether reinstatement would arouse hostility in the workplace, *Cowan,* 140 F.3d at 1160; *Ray,* 51 F.3d at 1254; *Roush,* 10 F.3d at 398; *Standley,* 5 F.3d at 322; *McKnight,* 973 F.2d at 1370-71; *Lewis,* 953 F.2d at 1280; *Duke,* 928 F.2d at 1423; (7) whether the plaintiff has since acquired similar work, *Roush,* 10 F.3d at 398; (8) whether the plaintiff's career goals have changed since the unlawful termination, *McKnight,* 973 F.2d at 1370-71; and (9) whether the plaintiff has the ability to return to work for the defendant employer-including consideration of the effect of the dismissal on the plaintiff's self-worth, *Newhouse,* 110 F.3d at 641; *Lewis,* 953 F.2d at 1280.

*Ogden*, 29 F. Supp.2d at 1010. I will consider each of these factors *seriatim.*

The first factor, SMX's continuation in business, weighs only slightly in favor of reinstatement. However, I give this factor less weight because SMX has been sold to Western Express and it reduced its Fort Dodge workforce by approximately 70 percent since Dollar worked there. The second factor, the availability of a comparable position,

weighs slightly in favor of reinstatement since SMX still maintains five or six driver recruiters at its Fort Dodge facility.

The third factor, the displacement of innocent employees, weighs strongly against reinstatement because there is no evidence that there are currently any openings for driver recruiters at SMX's Fort Dodge facility. My ordering Dollar's reinstatement would displace an innocent employee currently occupying a driver recruiter position. The fourth factor, whether the parties agree that reinstatement is a viable remedy, likewise weighs against reinstatement. *See Ray,* 51 F.3d at 1254; *Roush,* 10 F.3d at 398; *Best v. Shell Oil Co.,* 4 F. Supp. 2d 770, 777 (N.D. Ill. 1998) (turning directly to the issue of front pay after acknowledging the parties' agreement that reinstatement was not appropriate). Generally, because the parties are in the best position to gauge the feasibility or practicality of reinstatement, courts defer to a mutual belief regarding the feasibility of reinstatement. Here no such agreement exists, and neither party has asserted reinstatement as a viable remedy.

The fifth factor concerns the hostility caused by the underlying events as well as the attendant litigation. *See Cowan,* 140 F.3d at 1160; *Ray,* 51 F.3d at 1254; *Roush,* 10 F.3d at 398; *Standley,* 5 F.3d at 322; *McKnight,* 973 F.2d at 1370-71; *Lewis,* 953 F.2d at 1280; *Duke,* 928 F.2d at 1423. Again, no evidence was presented on this issue. The underlying events and this litigation have resulted in some degree of hostility between the parties. Accordingly, this factor weighs slightly against reinstatement.

The sixth factor is whether Dollar's reinstatement would arouse hostility in the workplace. *See, e.g., Cowan,* 140 F.3d at 1160. This factor cautions against reinstatement. Given the substantially reduced workforce at SMX's Fort Dodge facility and the small number of remaining employees, Dollar's court ordered reinstatement, resulting in the laying-off of a current worker, would engender co-worker hostility towards her.

The seventh and eighth factors, plaintiff's acquisition of similar work and change in plaintiff's career goals, both weigh against reinstatement. Dollar has not acquired similar work. Instead, she is now employed as hotel front desk clerk and night auditor. *See Roush*, 10 F.3d at 398; *Henry v. Lennox Indus., Inc.*, 768 F.2d 746, 753 (6th Cir. 1985). Likewise, I find that there has been a change in Dollar's career goals since her termination. After leaving SMX, Dollar has worked exclusively in the hotel industry. I find that, absent SMX's interference with Dollar's right to FMLA leave, she would have remained a SMX employee and would not have sought work in another career field. I base this conclusion on Dollar's testimony, coupled with the fact that she continuously worked for SMX for nearly nine years when first employed there and over one year during her second stint. Thus, this factor, too, weighs against reinstatement because SMX's conduct directly caused Dollar's shift in her career goals.

The final factor, Dollar's ability to return to work for SMX, s*ee Newhouse v. McCormick & Co., Inc.,* 110 F.3d 635, 641 (8th Cir. 1997); *Lewis,* 953 F.2d at 1280, is neutral as no evidence was presented on it. Having considered each of the pertinent factors, I find that Dollar's reinstatement is impracticable and reject it as a remedy here. Therefore, I consider front pay.

### ii. *Front pay*

The Eighth Circuit Court of Appeals has not provided factors to be considered in making a front pay determination under the FMLA. As a result, as with my analysis regarding reinstatement, I will consider factors traditionally approved by other courts in a front pay determination and which I enumerated in *Ogden:*

> (1) the plaintiff's age, *Barbour* [ *v. Merrill* ], 48 F.3d [1270] at 1280 [ (D.C. Cir. 1995) ]; (2) the length of time the plaintiff was employed by the defendant employer, *Standley,* 5 F.3d at 322; (3) the likelihood the employment would have continued

absent the discrimination, *Barbour,* 48 F.3d at 1280; *Standley,* 5 F.3d at 322; (4) the length of time it will take the plaintiff, using reasonable effort, to secure comparable employment, *Paolella v. Browning-Ferris, Inc.,* 158 F.3d 183, 194-95 n. 13 (3d Cir. 1998); *Kelley* [ *v. Airborne Freight Corp.*], 140 F.3d [335] at 355 n. 12 [ (1st Cir. 1998) ]; *HBE Corp.,* 135 F.3d at 555; *Downes v. Volkswagen of Am., Inc.,* 41 F.3d 1132, 1141 n. 8 (7th Cir. 1994); *Roush,* 10 F.3d at 399; *Standley,* 5 F.3d at 322; *Hukkanen v. Int'l Union of Operating Eng'rs, Hoisting & Portable Local No. 101*, 3 F.3d 281, 286 (8th Cir. 1993); *Shore v. Federal Express Corp.,* 777 F.2d 1155, 1160 (6th Cir. 1985); (5) the plaintiff's work and life expectancy, *Paolella,* 158 F.3d at 194-95 n. 13; *Downes,* 41 F.3d at 1141; *Roush,* 10 F.3d at 399; *Shore,* 777 F.2d at 1160; (6) the plaintiff's status as an at-will-employee, *Barbour,* 48 F.3d at 1280; *Schwartz v. Gregori,* 45 F.3d 1017, 1023 (6th Cir.), *cert. denied,* 516 U.S. 819, 116 S. Ct. 77, 133 L. Ed. 2d 36, (1995); (7) the length of time other employees typically held the position lost, *Barbour,* 48 F.3d at 1280; (8) the plaintiff's ability to work, *Lewis v. Federal Prison Indus. Inc.,* 953 F.2d 1277, 1281 (11th Cir. 1992); *Ortiz v. Bank of Am. Nat'l Trust & Sav. Ass'n,* 852 F.2d 383, 387 (9th Cir. 1987); (9) the plaintiff's ability to work for the defendant-employer, *Id.;* (10) the employee's efforts to mitigate damages, *Paolella,* 158 F.3d at 194-95 n. 13; *Barbour,* 48 F.3d at 1280; *Downes,* 41 F.3d at 1141; *Roush,* 10 F.3d at 399; *Shore,* 777 F.2d at 1160; and (11) the amount of any liquidated or punitive damage award made to the plaintiff, *Hadley v. VAM P T S,* 44 F.3d 372, 376 (5th Cir. 1995); *Hybert v. Hearst Corp.,* 900 F.2d 1050, 1056 (7th Cir. 1990); *Wildman v. Lerner Stores Corp.,* 771 F.2d 605, 616 (1st Cir. 1985).

*Ogden,* 29 F. Supp. 2d at 1015. I will consider each of these factors *seriatim*.

The first factor is plaintiff's age. *See Barbour,* 48 F.3d at 1280. Dollar was 48 years old at the time of trial. In *United Paperworkers Int'l Union, AFL-CIO, Local 274 v. Champion Int'l Corp.,* 81 F.3d 798, 805 (8th Cir. 1996), the plaintiff was awarded front

pay for twenty-four years, a time period which was intended to follow the plaintiff until he reached retirement age. The Court of Appeals for the Eighth Circuit did not rule directly on the issue, because it reversed the district court's denial of the defendant's motion for new trial, but it strongly indicated it would not approve of such a lengthy front pay award because the duration of the award was improperly speculative. *Id.* The court explained that "[a]n award of front pay until retirement ignores the plaintiff's duty to mitigate damages and the district court's corresponding obligation to estimate the financial impact of future mitigation. Instead of warranting a lifetime of front pay, [the plaintiff's] relatively young age should improve his future opportunities to mitigate through other employment." *Id.* (citing *Dominic v. Consolidated Edison Co.,* 822 F.2d 1249, 1258 (2d Cir. 1987)) (internal citation omitted).

As in *United Paperworkers,* Dollar is relatively young in terms of her work life. I find that Dollar's age is more pertinent to the duration of an award of front pay than it is to whether such an award is warranted. Dollar's age does not weigh against an award of front pay but rather counsels against an unduly lengthy award.

The second factor is Dollar's length of employment. Dollar was employed by SMX for approximately nine years during her first stint of employment and over one year during her second stint. Dollar's lengthy employment history with SMX weighs in favor of a front pay award. *See Standley,* 5 F.3d at 322.

I consider together the third factor, the likelihood that Dollar would have remained in her position, and the sixth factor, plaintiff's status as an at-will employee. While recognizing that Dollar was an at-will-employee, I find that, absent the FMLA violation, Dollar likely would have remained in her position at SMX until retirement. Although this factor is subject to some speculation, *see Barbour,* 48 F.3d at 1280; *Standley,* 5 F.3d at 322, the level of speculation is minimal and subject only to the general uncertainties of life.

Nothing in the record suggests that Dollar would have left her employment with SMX. There is no evidence to suggest that SMX was dissatisfied with Dollar's actual performance. It is undisputed that Dollar and SMX considered her position working with truck drivers to be her "niche." These factors weigh in favor of an award of front pay. *See Barbour,* 48 F.3d at 1280; *Schwartz,* 45 F.3d at 1023.

The fourth factor is the length of time necessary to secure comparable employment. Dollar is currently employed as a hotel front desk clerk and night auditor. Given her relatively high salary at SMX, her level of education, and lack of a specialized skill, I am persuaded that Dollar will probably never gain comparable employment or be able to find a job that paid as well as her SMX position. This conclusion is bolstered by the fact that it took Dollar over one year to find even part-time employment as a hotel front desk clerk. The unavailability of comparable work supports an award of front pay. *See Paolella,* 158 F.3d at 194-95 n. 13; *Kelley,* 140 F.3d at 355 n. 12; *HBE Corp.,* 135 F.3d at 555; *Downes,* 41 F.3d at 1141; *Roush,* 10 F.3d at 399; *Standley,* 5 F.3d at 322.

I find that the fifth factor, Dollar's life and work expectancy, *see Paolella,* 158 F.3d at 194-95 n.13, are neutral considerations. Dollar is currently 48 years old. Dr. Matilla testified that Dollar had a life expectancy of 82 years.

I, likewise, find the seventh factor, the length of time other employees typically hold the position Dollar lost, *see Barbour,* 48 F.3d at 1280, to be neutral. No evidence was presented at trial regarding SMX driver recruiters' typical length of employment and I am unwilling to speculate on it. I consider this factor to be a neutral consideration and give it no weight.

The eighth factor is Dollar's ability to return to full-time work. Dollar has returned to work full-time as a hotel front desk clerk and night auditor, but at a twenty-five percent reduction in pay and without any benefits. This factor weighs in favor of front pay.

Similarly, the ninth factor, Dollar's ability to return to work for SMX, weighs slightly in favor of an award of front pay. Dollar's mental health condition would not preclude her from returning to a position as a driver recruiter at SMX. However, as previously discussed, there is no evidence of any such openings at present, and SMX has substantially reduced its work force in Fort Dodge, thereby limiting possible equivalent positions available to Dollar.

The tenth factor is a plaintiff's effort to mitigate damages. In FMLA cases, as in other employment discrimination cases, a plaintiff has a duty to reasonably mitigate damages. *See Killian v. Yorozu Automotive Tenn., Inc.,* 454 F.3d 549, 556-57 (6th Cir. 2006); *Arban v. West Publ'g Corp.,* 345 F.3d 390, 406 (6th Cir. 2003); *Viereck v. City of Gloucester City,* 961 F. Supp. 703, 709 (D.N.J. 1997). "The burden of proving that the employee did not make reasonable efforts is on the defendant." *Excel Corp. v. Bosley,* 165 F.3d 635, 639 (8th Cir. 1999); *Migis v. Pearle Vision, Inc.,* 135 F.3d 1041, 1045 (5th Cir. 1998); *Booker v. Taylor Milk Co.,* 64 F.3d 860, 864 (3d Cir. 1995). "In carrying such [a] burden . . . the defendant must show more than that there were steps towards finding comparable employment other than those [the claimant] took; it must 'show that the course of conduct plaintiff actually followed was so deficient as to constitute an unreasonable failure to seek employment.'" *Reilly v. Cisneros,* 835 F. Supp. 96, 99 (W.D.N.Y.1993), *aff'd,* 44 F.3d 140 (2d Cir. 1995) (quoting *E.E.O.C. v. Kallir, Philips, Ross, Inc.,* 420 F. Supp. 919, 925 (S.D.N.Y.1976), *aff'd,* 559 F.2d 1203 (2d Cir. 1977)).

The standard required of a plaintiff to show mitigation is less demanding. As the Eighth Circuit Court of Appeals has observed:

> Wrongfully discharged claimants must use reasonable efforts to mitigate their damages, *see, e.g., Fiedler v. Indianhead Truck Line, Inc.,* 670 F.2d 806, 809 (8th Cir. 1982), but this burden is not onerous and does not require success. *See, e.g., Rasimas*

> *v. Michigan Department of Mental Health,* 714 F.2d 614, 624
> (6th Cir. 1983) (reasonable diligence standard), *cert. denied,*
> 466 U.S. 950 (1984). All that is required by law is an honest,
> good faith effort. *E.g., United States v. Lee Way Motor
> Freight, Inc.,* 625 F.2d 918, 938 (10th Cir. 1979).

*Brooks v. Woodline Motor Freight, Inc.,* 852 F.2d 1061, 1065 (8th Cir. 1988). "[A] plaintiff may satisfy the 'reasonable diligence' requirement by demonstrating a continuing commitment to be a member of the work force and by remaining ready, willing, and available to accept employment." *Booker v. Taylor Milk Co., Inc.,* 64 F.3d 860, 865 (3d Cir. 1995) (citing *Hutchison v. Amateur Elec. Supply, Inc.,* 42 F.3d 1037, 1044 (7th Cir. 1994); *Ford v. Nicks,* 866 F.2d 865, 873 (6th Cir. 1989)). "In general, a plaintiff fails to mitigate adequately and therefore is [not] entitled to . . . front pay 'to the extent he [or she] fails to remain in the labor market, fails to accept substantially similar employment, fails diligently to search for alternative work, or voluntarily quits alternative employment without good reason.'" *Reilly,* 835 F. Supp. at 99 (quoting *N.L.R.B. v. Madison Courier, Inc.,* 472 F.2d 1307, 1317 (D.C. Cir. 1972)).

When a plaintiff rejects an employment offer, the employer must prove that the offered position was substantially similar, showing that the position affords "virtually identical promotional opportunities, compensation, job responsibilities, working conditions and status as the former position." *Reilly,* 835 F. Supp. at 100; *accord Sellers v. Delgado College,* 902 F.2d 1189, 1193 (5th Cir. 1990) ("Substantially equivalent employment is that employment which affords virtually identical promotional opportunities, compensation, job responsibilities, and status as the position from which the Title VII claimant has been discriminatorily terminated.").

SMX has not met its burden that Dollar failed to mitigate her damages. Indeed, SMX never explicitly argued that Dollar failed to mitigate her damages. SMX presented

no evidence that there was comparable employment available in Fort Dodge when Dollar accepted her present position. Nor did SMX show that Dollar did not make an "honest, good faith effort" to minimize her damages by obtaining full-time employment. *See Brooks v. Woodline Motor Freight, Inc.,* 852 F.2d 1061, 1065 (8th Cir. 1988). To the contrary, Dollar immediately sought employment as soon as she was cleared to return to work. While she chose to enter a new career field, it was only after a fifteen-month job search. This factor weighs in favor of front pay.

The eleventh and final factor is the amount of any liquidated damages. At least three circuit courts of appeals, the First, Fifth, and the Seventh, have explicitly required a court to consider a liquidated damage award in determining the issue of front pay. *See Palasota v. Haggar Clothing Co.,* 499 F.3d 474, 490 (5th Cir. 2007) (noting in ADEA case that "[w]e have held that 'a substantial liquidated damage award may indicate that an additional award of front pay is inappropriate or excessive.'") (quoting *Walther v. Lone Star Gas Co.,* 952 F.2d 119, 127 (5th Cir. 1992)); *Price v. Marshall Erdman & Assocs., Inc.,* 966 F.2d 320, 326 (7th Cir. 1992) (observing in ADEA case that the presence of liquidated damages "should play only a very small role in that determination); *Wildman v. Lerner Stores Corp.,* 771 F.2d 605, 616 (1st Cir. 1985) (noting in ADEA case that a court contemplating a front pay award "should consider the circumstances of the case, including the availability of liquidated damages."). The Eighth Circuit Court of Appeals, however, has never adopted the reasoning in these decisions. Moreover, the Eighth Circuit would be unlikely to give much, if any, weight to this factor. *See Newhouse,* 110 F.3d at 643 (declining to require district court to consider this factor and observing in an ADEA case that "liquidated damages are punitive in nature under the ADEA . . . [whereas] [f]ront pay . . . is equitable relief . . . and the resulting award of liquidated damages simply does not affect the . . . court's determination of appropriate equitable relief."). Thus, the amount of any liquidated

damages awarded is not considered on the question of front pay. "'[T]he purpose for the award of liquidated damages is the reality that the retention of a workman's pay may well result in damages too obscure and difficult of proof for estimate other than by liquidated damages.'" *Jordan v. United States Postal Serv.*, 379 F.3d 1196, 1202 (10th Cir. 2004) (quoting *Renfro v. City of Emporia*, 948 F.2d 1529 (10th Cir. 1991)). The purpose of front pay is also to make the plaintiff whole. *See Christensen v. Titan Dist., Inc.*, 481 F.3d 1085, 1098 (8th Cir. 2007); *Cowan,* 140 F.3d at 1160; *Standley,* 5 F.3d at 322. Consequently, these remedies are designed to achieve very different purposes in this quest. Thus, the amount of liquidated damages awarded is a neutral consideration to be given no weight. *Cf. Newhouse,* 110 F.3d at 643 (declaring in ADEA case that the amount of liquidated damages awarded "does not affect the . . . court's determination of appropriate equitable relief.").

Based on the trial evidence, I have a firm conviction that reinstatement is not appropriate and front pay is warranted.

### iii.    *Calculation of front pay*

The first step in calculating Dollar's front pay award is to determine its duration. All front pay awards are to some degree speculative. However, the award should not be "unduly speculative." *Barbour,* 48 F.3d at 1280; *McKnight,* 973 F.2d at 1372. Dollar has not requested a specific period of front pay.

Based on the evidence, a ten-year front pay award is appropriate. It is neither unduly speculative or excessive. The Eighth Circuit Court of Appeals and other federal courts of appeals have affirmed front pay awards of ten years or more. *See Hukkanen v. Int'l Union of Operating Eng'rs, Hoisting & Portable Local No. 101,* 3 F.3d 281, 286 (8th Cir. 1993) (holding that a ten year front pay award did not constitute an abuse of discretion); *see also Donlin v. Philips Lighting North Am. Corp*, 581 F.3d 73, 88 (3rd Cir.

2009) (holding that district court did not abuse its discretion in awarding plaintiff front pay for ten years); *Meacham v. Knolls Atomic Power Lab.,* 381 F.3d 56, 79 (2d Cir. 2004) (affirming front pay awards of nine to twelve and one-half years), *vacated on other grounds sub nom KAPL, Inc. v. Meacham,* 544 U.S. 957 (2005); *Gotthardt v. National R.R. Passenger Corp.,* 191 F.3d 1148 (9th Cir. 1999) (affirming an eleven year front pay award); *Pierce v. Atchison, Topeka & Santa Fe Ry. Co.,* 65 F.3d 562, 574 (7th Cir. 1995) (holding that ten-year front pay award did not constitute an abuse of discretion). Dollar's future at SMX as a driver recruiter looked promising and she was only 44 years old when fired. There is no reason to believe that, but for her wrongful firing, she would not still be employed at SMX. This conclusion is supported by Dollar having worked successfully at SMX for almost nine years during her first stint of employment there. It is also supported by Dollar's positive performance reviews. While SMX has reduced the number of employees at its Fort Dodge facility since Dollar's firing, it has not eliminated any driver recruiter positions.

Dollar's present position pays substantially less than she was making at SMX, and does not have the health, dental, and vision benefits she received at SMX. Taking into account Dollar's current age (48) and her educational and vocational background, for the foreseeable future, Dollar will continue to occupy a lower paying job, compared to her former SMX position. Nothing suggests that Dollar will be able to find comparable employment in the trucking industry in Fort Dodge for the remainder of her working life. The serious lack of comparable jobs in the Fort Dodge area is best illustrated by Dollar's lengthy job search resulting in her finding only a part time position in another industry, at substantially reduced pay. Given the dearth of comparable jobs, even ten years is insufficient to close the gap between her current pay and her SMX salary. Thus, while ten years' front pay is appropriate, striking the proper balance between the need to make Dollar

"whole" and the need to avoid unduly speculative front pay awards, it is, in reality, unlikely to make her whole. It is a conservative award.

The next step is to calculate Dollar's estimated yearly income from SMX for this ten year period less her mitigation income. At trial, Dollar offered evidence of her front pay damages through economist Dr. Mattila. *See* Plaintiff's Ex. 17, Revised Earnings Tables. He based his calculations on Dollar's salary at the time of her termination, $650 per week and assumed a four percent growth rate in Dollar's wages per year. He also assumed that Dollar would continue in the same earning range as her current job with the same assumed growth rate. Dr. Mattila also assumed that SMX made the 2010 national company average contribution, $3,849, as its share of Dollar's health care benefits. Dr. Mattila further assumed that Dollar had a life expectancy of 82 years.

To calculate the present value of Dollar's projected SMX earnings for a given year, Dr. Mattila reduced Dollar's projected income for that year to present value and then multiplied that figure by Dollar's probability of survival. Similarly, to achieve the present value of Dollar's projected future earnings in her current job for a given year, Dr. Mattila again reduced Dollar's projected income for that year to present value and then multiplied that figure by Dollar's probability of survival. To calculate Dollar's lost future wages for any given year, Dr. Mattila took the present value of Dollar's projected SMX earnings for that year, and subtracted the present value of Dollar's projected future earnings in her current job for that year. In order to calculate the present value of Dollar's projected future lost SMX health insurance benefits, Dr. Mattila reduced the value of Dollar's projected health insurance benefits for that year to present value and then multiplied that figure by Dollar's probability of survival.

SMX presented no evidence contradicting Dr. Mattila's analysis, methodology, or calculations for projected loss of income and benefits, and I find no reason to question his

calculations. Dr. Mattila's calculations are reasonable and based on sound economic principles. I adopt his calculations. Therefore, a front pay award is appropriate for a period ending April 13, 2021, based on Dollar's regular pay at SMX reduced for the probability of survival and adjusted for net present value less her current pay as a hotel clerk reduced for the probability of survival and adjusted for net present value. Added to this figure is Dollar's lost health care contributions reduced for the probability of survival and adjusted for net present value. The lost wages portion of the front pay award is calculated as follows:

| (1) Year | (2) SMX pay in present value | (3) Prob. of survival | (4) SMX pay reduced for Prob. of survival (column 2 multiplied by column 3) | (5) Desk clerk pay in present value | (6) Prob. of survival | (7) Desk clerk pay reduced for Prob. of survival (column 5 times column 6) | (8) Future lost pay (column 4 minus column 7) |
|---|---|---|---|---|---|---|---|
| 2011 | 24,824 | 0.9974 | 24,759 | 17,174 | 0.9974 | 17,129 | 7,630 |
| 2012 | 34,708 | 0.9947 | 34,523 | 24,012 | 0.9947 | 23,884 | 10,639 |
| 2013 | 34,098 | 0.9917 | 33,816 | 23,590 | 0.9917 | 23,395 | 10,421 |
| 2014 | 33,499 | 0.9885 | 33,116 | 23,176 | 0.9885 | 22,910 | 10,206 |
| 2015 | 32,911 | 0.9851 | 32,421 | 22,769 | 0.9851 | 22,430 | 9,991 |

45

| 2016 | 32,333 | 0.9814 | 31,732 | 22,369 | 0.9814 | 21,953 | 9,779 |
|---|---|---|---|---|---|---|---|
| 2017 | 31,765 | 0.9774 | 31,048 | 21,976 | 0.9774 | 21,480 | 9,568 |
| 2018 | 31,207 | 0.9731 | 30,369 | 21,590 | 0.9731 | 21,010 | 9,359 |
| 2019 | 30,658 | 0.9685 | 29,694 | 21,210 | 0.9685 | 20,543 | 9,151 |
| 2020 | 30,120 | 0.9636 | 29,023 | 20,838 | 0.9636 | 20,079 | 8,944 |
| 2021 | 8,255 | 0.9582 | 7,910 | 5,711 | 0.9582 | 5,472 | 2,464 |
| Total | | | | | | | 98,152 |

The lost health insurance portion of the front pay award is calculated as follows:

| (1) Year | (2) SMX health insurance contribution reduced to present value | (3) Probability of survival | (4) Future lost health insurance benefits (column 2 multiplied by column 3) |
|---|---|---|---|
| 2011 | 2,834 | 0.9974 | 2,827 |
| 2012 | 3,964 | 0.9947 | 3,943 |
| 2013 | 3,894 | 0.9917 | 3,862 |
| 2014 | 3,826 | 0.9885 | 3,782 |
| 2015 | 3,759 | 0.9851 | 3,703 |
| 2016 | 3,693 | 0.9814 | 3,624 |
| 2017 | 3,628 | 0.9774 | 3,546 |
| 2018 | 3,564 | 0.9731 | 3,468 |
| 2019 | 3,501 | 0.9685 | 3,391 |
| 2020 | 3,440 | 0.9636 | 3,315 |
| 2021 | 952 | 0.9582 | 913 |
| Total | | | 36,374 |

Combining the amounts of these two tables, $98,152 plus $36,374, results in a total front pay award of $134,526.

### d. *Liquidated damages*

Under the FMLA, liquidated damages tied to the amount of damages found in § 2617(a)(1)(A)(i)(I) or (II) are available. A plaintiff may be entitled to "liquidated damages" equal to the sum of "any wages, salary, employment benefits, or other compensation denied or lost to such employee by reason of the violation," § 2617(a)(1)(A)(i)(I). When a FMLA violation results in damages, "[l]iquidated damages are awarded presumptively to [the] employee . . . unless the employer demonstrates that its violation was in good faith and that it had a reasonable basis for believing that its conduct was not in violation of the FMLA." *Cooper v. Fulton County, Ga.,* 458 F.3d 1282, 1287 (11th Cir. 2006); *see also Traxler v. Multnomah Cnty.,* 596 F.3d 1007 (9th cir. 2010) (noting that a FMLA's "liquidated damages" provision subjects an employer to liquidated damages "unless the employer can prove that its employment action was taken in 'good faith' and that it had 'reasonable grounds for believing that [its action] was not a violation'") (alteration in original) (quoting § 2617(a)(1)(A) (iii)). SMX's FMLA violation was not in good faith. Nelson failed to consider the FMLA when he fired Dollar. He was willfully indifferent to it. More importantly, SMX lacked any reasonable grounds to believe that its actions complied with the FMLA.

### e. *Liquidated damages: front pay*

In *Traxler v. Multnomah County,* 596 F.3d 1007 (9th Cir. 2010), the Ninth Circuit Court of Appeals concluded that front pay under the FMLA is not a type of damage that falls under § 2617(a)(1)(A)(i)(I) or (II). Rather, the court found that an award of front pay is an "equitable remedy" available under § 2617(a)(1)(B). *Id.* at 1011-14; *see McBurney,* 398 F.3d at 1001 n.2 (recognizing the existence of equitable remedies under § 2617(a)(1)(B) and noting that "[f]ront pay is designed to provide an equitable remedy when it is impractical to order the employee's reinstatement to his or her previous job."); *see also Dotson v. Pfizer,*

*Inc.*, 558 F.3d 284, 300 (4th Cir. 2009) (noting that the FMLA "does not identify front pay as an equitable remedy, but we have recognized it as a proper form of relief that is 'an alternative and complement to reinstatement.'") (quoting *Cline v. Wal-Mart Stores, Inc.*, 144 F.3d 294, 307 (4th Cir. 1998)). This conclusion is understandable given that front pay is an equitable remedy under other employment-related statutes. *See Pollard v. E.I. du Pont de Nemours & Co.*, 532 U.S. 843, 850-54 2001) ((recognizing "front pay" as an equitable remedy authorized under Title VII); *Whittington v. Nordam Group Inc.*, 429 F.3d 986, 1000 (10th Cir. 2005) (observing in Age Discrimination in Employment Act case that "[f]ront pay is an equitable remedy awarded by the court (not the jury)."); *Pals v. Schepel Buick & GMC Truck, Inc.*, 220 F.3d 495, 500-01 (7th Cir. 2000) (observing that front pay is an equitable remedy under the Americans with Disabilities Act); *Lussier v. Runyon*, 50 F.3d 1103, 1107-08 (1st Cir. 1995) ("[We hold that front pay is an available equitable remedy under Title VII and, hence, under the Rehabilitation Act."). Absent any contrary authority, I will follow the implied extension of *Traxler's* holding: front pay is an equitable award that falls under § 2617(a)(1)(B) and is ineligible for inclusion in a liquidated damages computation. Therefore, only Dollar's award of $80,793 for back wages and loss of health insurance contributions may be used in calculating liquidated damages.[9] Dollar is entitled to liquidated damages in the sum of $80,793.

### f.    *Punitive damages*

Dollar also seeks punitive damages from SMX. In passing the Civil Rights Act of 1991, Congress provided for compensatory and punitive damages in both Title VII cases and American with Disabilities Act cases. *See* 42 U.S.C. § 1981a. Two years later, Congress did not provide for punitive damages when it enacted the FMLA. *See* 29 U.S.C. § 2617. In *Nevada Dep't of Human Res. v. Hibbs,* 538 U.S. 721, 735 (2003), the United States

---

[9]The *Traxler* decision, however, does not explain why front pay could not be considered future lost "wages", subject to liquidated damages, nor has Dollar advanced this argument.

Supreme Court noted that the remedial provisions of the FMLA are narrow, explaining: "We also find significant the many other limitations that Congress placed on the scope of this measure. . . . [T]he cause of action under the FMLA is a restricted one: The damages recoverable are strictly defined and measured by actual monetary losses. . . ." *Id.* at 738-40. Although in *Hibbs*, the Court did not specifically address the availability of punitive damages under the FMLA, a plethora of federal courts have concluded that the FMLA's remedies do not include punitive damages. *See Brown v. Nutrition Mgmt. Servs. Co.,* 370 Fed. Appx. 267, 270 (3d Cir. 2010) (upholding order for new trial because the jury instructions may have misled the jury into believing that punitive damages were recoverable under the FMLA); *Farrell v. Tri-Country Metro. Transp. Dist. of Or.,* 530 F.3d 1023, 1025 (9th Cir. 2008) ("It is well-settled that the FMLA, by its terms, 'only provides for compensatory damages and not punitive damages.'") (quoting *Liu v. Amway Corp.*, 347 F.3d 1125, 1133 n.6 (9th Cir. 2003)); *Jakischa v. Centr. Parcel Express,* 106 Fed. Appx. 436, 440 (6th Cir. 2004) (noting the FMLA does not provide for punitive damages); *see also Rensink v. Wells Dairy, Inc.* 741 F. Supp. 2d 1038, 1062 (N. D. Iowa 2010) ("Prohibited damages under the FMLA include emotional distress, nominal, consequential, and punitive damages."); *Roseboro v. Billington*, 606 F. Supp.2d 104, 108 (D.D.C. 2009) (noting that punitive damages unavailable under the FMLA); *Collins v. OSF Healthcare Sys.,* 262 F. Supp. 2d 959, 963 (C.D. Ill. 2003) (stating that "it is well-established that punitive damages are not available under the [FMLA]."); *Keene v. Rinaldi,* 127 F. Supp. 2d 770, 771 (M.D.N.C. 2000) ("The explicit language of the FMLA does not mention punitive damages," and "the presence of the liquidated damages subsection suggests that the drafters of the Act included that subsection in lieu of allowing punitive damages."); *Settle v. S.W. Rodgers, Co., Inc.,* 998 F. Supp. 657, 666 (E.D. Va. 1998) ("[B]y its own terms, the FMLA does not provide for either punitive damages or for damages for emotional distress."), *aff'd* 182 F.3d 909 (4th Cir. 1999); *McAnnally v. Wyn South Molded Prods., Inc.,* 912 F. Supp. 512 (N.D. Ala. 1996) (finding punitive damages unavailable under the

FMLA).[10] Finding no reason to disagree with these decisions, I find punitive damages are unavailable in this FMLA case.

### g.   *Interest*

Dollar has also requested interest in her complaint. Section 2617 provides that when an employer violates the FMLA, such employer shall be liable to the employee for "the interest on the amount described in clause (i) calculated at the prevailing rate." 29 U.S.C. § 2617(a)(1)(A)(ii). Clause (i) equates to my back pay award of $80,793. Section 2617's language indicates that an award of interest is mandatory. *Id.* § 2617 ("Any employer who violates section 2615 of this title *shall* be liable to any eligible employee affected . . . .") (emphasis added). The difficulty in determining the appropriate interest rate stems from § 2617's failure to indicate what rate of interest should be considered the "prevailing rate."

Generally, the decision of which rate of interest to apply for prejudgment interest is a "'[m]atter[ ] confided to the district court's broad discretion.'" *Endico Potatoes, Inc. v. CIT Group/Factoring, Inc.,* 67 F.3d 1063, 1071 (2d Cir. 1995) (quoting *Commercial Union Assurance Co. v. Milken,* 17 F.3d 608, 613-14 (2d Cir. 1994)). The award of prejudgment interest under Title VII is thoroughly examined in *Madison v. IBP, Inc.,* 149 F. Supp. 2d 730, 782 (S.D. Iowa 1999). Consistent with the applicable guidelines discussed in *Madison,* prejudgment interest on Dollar's back pay is awarded at the statutory rate set out in Iowa Code § 668.13(3), with interest accruing from the date of the commencement of this case to the date of the entry of judgment. No prejudgment interest will be awarded on the liquidated damages and front pay portion of the judgment. Post-judgment interest is

---

[10]Although the Eighth Circuit Court of Appeals has not addressed whether punitive damages are available under the FMLA, the court has observed that "[t]he FMLA only permits recovery for 'wages, salary, employment benefits, or other compensation denied or lost,' and when such benefits are not denied or lost, an eligible employee may recover 'any actual monetary losses sustained . . . as a direct result of the violation, such as the cost of providing care.'" *Rodgers v. City of Des Moines,* 435 F.3d 904 (8th Cir. 2006) (citing 29 U.S.C. § 2617(a)(1)(A)(i)(I), (II)).

governed by 28 U.S.C. § 1961. Interest shall accrue on the entire award, including liquidated damages and front pay, from and after the entry of judgment at the federal judgment rate.

### III.  CONCLUSION AND ORDER FOR JUDGMENT

SMX handled Dollar's need for leave for her depression poorly, firing her without considering whether her leave was protected by the FMLA.  Consequently, the company's actions violated the FMLA.  This violation, in turn, entitles Dollar to remedies under the act.  Having considered those remedies, I conclude that an award of $80,793 for back pay and loss of health insurance contributions is warranted.  In addition, Dollar is entitled to an award of liquidated damages in the sum of $80,793, an amount equaling Dollar's back pay and loss of health insurance contributions.  Dollar, however, is not entitled to punitive damages because the FMLA doe not provide for them.  Finally, I conclude that an award of prospective equitable relief is warranted.  The "preferred" remedy of reinstatement is not appropriate here.  Instead, I find that front pay is the appropriate "make whole" remedy. I further find that a duration of ten years of front pay and benefits, totaling $134,526, strikes the proper balance between holding SMX responsible for placing Dollar in the position in which she finds herself and avoiding an unduly speculative front pay award.  To recap, Dollar is entitled to the following damages:

| | |
|---|---|
| Back pay and loss of health care contributions | $80,793 |
| Liquidated damages | $80,793 |
| Front pay | $134,526 |
| Total damages | $296,112 |

THEREFORE, I order judgment be entered in favor of Dollar and against SMX in the sum of $80,793, plus interest from the date of the filing of this complaint to the date of

51

the entry of the judgment at the Iowa judgment rate. Judgment shall also enter in favor of Dollar and against SMX for $215,319 in front pay and liquidated damages without prejudgment interest. Interest on the total judgment, $296,112, shall accrue from and after the date of the entry of the judgment at the federal judgment rate.

Plaintiff's counsel is reminded that Local Rule 54.1(a) instructs that a motion for an award of attorney fees must be filed within the time called for in Federal Rule of Civil Procedure 54(d)(2)(B), *see* N.D. Ia. L.R. 54.1(a), which requires that such motions be filed "no later than 14 days after the entry of Judgment." FED. R. CIV. P. 54(d)(2)(B).

**IT IS SO ORDERED.**

**DATED** this 13th day of April, 2011.

MARK W. BENNETT
U. S. DISTRICT COURT JUDGE
NORTHERN DISTRICT OF IOWA